**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SIMMONS FIRST NATIONAL BANK, as successor in interest to Southwest Community Bank )<br><br>Plaintiff, )<br><br>v. )<br><br>CHARLES D. O'KIEFFE, individually, and JOHN D. O'KIEFFE and WILLIAM P. O'KIEFFE, as Co-Trustees of the CHARLES D. O'KIEFFE TRUST, dated February 2, 1996, )<br><br>Defendants-Third Party Plaintiffs, )<br><br>v. )<br><br>ROBERT C. WOOLARD, KAREN O. WOOLARD, ROBERT B. MADDOX, ROBERT BUTLER, and PAUL WALDRON, )<br><br>Third Party Defendants. ) | No. 11 C 729<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Simmons First National Bank ("Simmons"), as successor in interest to Southwest Community Bank ("SCB"), initiated this lawsuit to enforce guaranties on loans issued by SCB to three borrowers involved in a residential development project in Missouri. The guarantor, Charles O'Kieffe, initially denied liability, but he nevertheless filed a third-party complaint seeking contribution from Robert Woolard, Karen Woolard, Robert Maddox, Robert Butler, and Paul Waldron (collectively, "Third-Party Defendants") should the guaranties be enforced against him. O'Keiffe has since settled with Simmons, but he still maintains the suit for contribution. Third-Party Defendants Butler, Waldron, and Maddox have moved to dismiss the third-party complaint for lack

of personal jurisdiction,[1] and, for the reasons explained herein, their motions are granted.[2]

## FACTS

In 2008 and 2009, O'Kieffe signed guaranties on five loans issued by SCB to three borrowers: Kenwilago Group, LLC ("Kenwilago"), Cliffs at Indian Point, LLC ("Cliffs"), and Premiere Properties of the Ozarks, LLC ("Premiere") (Compl. ¶¶ 19, 36, 52, 75, 97-98.) All of the loans were for a residential development project consisting of condominiums and cabins in Branson, Missouri. (Third-Party Compl. ¶ 12.) When the borrowers defaulted, Simmons filed this suit to enforce O'Kieffe's guaranties. As stated, O'Kieffe has settled with Simmons, but still seeks contribution from Third-Party Defendants who, O'Kieffe claims, were the original guarantors of the five loans. (Third-Party Compl. ¶ 1.) Specifically, and as relevant to this opinion, O'Kieffe alleges that Butler and Maddox are co-guarantors of the Kenwilago loan, and that Butler, Maddox, and Waldron are co-guarantors of the Cliffs loan. (Third-Party Compl. ¶¶ 16, 23.) O'Kieffe also seeks contribution from Karen and Robert Woolard, who he claims are co-guarantors of all five loans (Third-Party Compl. ¶¶ 16, 23, 30, 37, 44), but since the Woolards have not answered the third-party complaint, the court need not address those claims further at this time.

### A. The Guaranties

There are two guaranty agreements relevant to this opinion. The first one, signed January 15, 2009, makes O'Kieffe liable for $339,726.44, plus interest and fees, should Cliffs default on its loan from SCB. (Guaranty (hereinafter "Cliffs Guaranty"), Ex. E to Compl., ¶ 4.) The Cliffs

---

[1] The court's subject matter jurisdiction is secure. Simmons, like its predecessor SCB, is incorporated in Arkansas and has its principal place of business there. (Compl. [1] ¶ 1.) Defendant and Third-Party Plaintiff O'Kieffe is a resident of Illinois. (Compl. ¶ 3.) Each of the Third-Party Defendants resides outside of Illinois: the Woolards in Missouri, Maddox in Arizona, Butler in North Carolina, and Waldron in Virginia. (Third-Party Compl. [34] ¶¶ 5-9.)

[2] The Woolards did not answer the third-party complaint and are in default. Butler's and Waldron's motions are fully briefed. O'Kieffe did not respond to Maddox's motion, and the court, therefore, deems it unopposed.

Guaranty contains a choice-of-law provision specifying that the contract "shall be governed according to the laws of the State in which it is executed." (Cliffs Guaranty ¶ 13.) The top of the first page of the Cliffs Guaranty identifies its location as "Ozark, Missouri," without further explanation. (*See* Cliffs Guaranty.) The underlying $1.65 million loan agreement between Cliffs and SCB also states, under the heading "Applicable Law," that "[t]he law of the state of Missouri will govern this note." (Note (hereinafter "Cliffs Note"), Ex. D to Compl., at 2.)

By signing the second guaranty, also on January 15, 2009, O'Kieffe agreed to be held liable for all Kenwilago's indebtedness. (Guaranty (hereinafter "Kenwilago Guaranty"), Ex. B to Compl., ¶ 4.) The underlying loan between Kenwilago and SBC was for $1.8 million. (Note (hereinafter "Kenwilago Note"), Ex. A to Compl., at 1.) As with the Cliffs Guaranty, the Kenwilago Guaranty identifies Ozark, Missouri as the document's location (Kenwilago Guaranty at 1), but the second page of the Kenwilago Guaranty—which may include a choice-of-law provision— is absent from the record (the first page was submitted twice). Regardless, the court presumes that the Kenwilago Guaranty also contains the choice-of-law provision requiring the agreement be governed by the law of the state in which it was executed, *i.e.*, Missouri law, because O'Kieffe and SCB executed the Kenwilago Guaranty on the same day as the Cliffs Guaranty, and the agreements are otherwise identical. The loan agreement between Kenwilago and SCB also declares that Missouri law will govern the underlying $1.8 million note. (Kenwilago Note at 2.)

**B.    Third-Party Defendants' Contacts With Illinois**

According to O'Kieffe's allegations, Kenwilago, formerly known as Argonaut Midwest Holdings, LLC ("Argonaut Midwest"), initiated a residential development project in Branson, Missouri in 2004. (Third Party Pls.' Resp. to Mots. to Dismiss Third-Party Compl.(hereinafter "O'Kieffe's Resp.") [65] at 2.) O'Kieffe states, further, that in 2005, Butler, Waldron, and Maddox created Cliffs, which then entered into an agreement to build and market condominiums with Kenwilago. (O'Kieffe's Resp. at 2.) The following year, in 2006, both Kenwilago and Cliffs obtained

loans from SCB in order to finance the development in Branson. (O'Kieffe's Resp. at 2-3.) Prior to 2009, O'Kieffe claims, the Cliffs loan was guaranteed by all five Third-Party Defendants and the Kenwilago loan was guaranteed by all Third-Party Defendants but Waldron. (O'Kieffe Resp. at 3.) When Third-Party Defendants sought an extension and modification of the Cliffs loan in 2008, O'Kieffe states, SCB required additional collateral; if Third-Party Defendants could not provide that collateral, SCB would deny the extension, call the loan, and require full payment from Cliffs or from the original guarantors, Third-Party Defendants. (O'Kieffe Resp. at 4.) Thus, O'Kieffe claims that, with Butler and Waldron's support, Robert Woolard solicited new guaranties from O'Kieffe in order to bolster Third-Party Defendants' financial standing and secure the extension.[3] (O'Kieffe's Resp. at 4.)

Specifically, O'Kieffe alleges that the Third-Party Defendants "agreed that [Robert] Woolard would go to Illinois and use his familial relationship with O'Kieffe in order to secure his investment and signatures on the guaranties."[4] (O'Kieffe's Resp. at 4.) O'Kieffe, however, does not identify any particular contact that Woolard made with him, nor does he describe the dates or times of any specific communication he had with Robert Woolard; he states simply that "Butler and Waldron agreed to have [Robert] Woolard communicate with O'Kieffe by phone and in person in Illinois." (O'Kieffe's Resp. at 10.)

### i. Robert Butler

In support of his argument that this court may assert personal jurisdiction over Butler, O'Kieffe submits the declaration of Michael Hyams, Chief Operating Officer of Premiere Properties.[5]

---

[3] O'Kieffe does not explain the need for an additional guarantor on the Kenwilago loan.

[4] O'Kieffe's sister, Karen Woolard, was married to Robert Woolard. (O'Kieffe's Resp. at 4).

[5] Premiere Properties was created in 2008 by members Hyams, Maddox, O'Kieffe,
(continued...)

4

(*See* Hyams Decl., Ex. 1 to O'Kieffe's Resp.)  According to O'Kieffe, Hyams's declaration demonstrates the existence of an agreement between Butler and Robert Woolard to solicit the guaranties from O'Kieffe in Illinois.  (O'Kieffe's Resp. at 4. )  Hyams, however, speaks only to Butler's *knowledge* of Robert Woolard's efforts, stating: "In my meetings with Robert Butler and Robert Maddox in 2008, Robert Butler stated that he was aware that O'Kieffe was Robert Woolard's brother-in-law and Karen Woolard's brother, that O'Kieffe had significant personal wealth, that O'Kieffe lived in Illinois, and that Robert Woolard had convinced O'Kieffe to invest in Argonaut Midwest [n/k/a Kenwilago] ."  (Hyams Decl. ¶ 13.)  O'Kieffe also relies on the existence of a prior business relationship between the parties: in 2003 and 2004 O'Kieffe loaned $365,000 to Argonaut Midwest, of which Butler was president and part owner at the time.  (Third-Party Pls.' Combined Sur-Reply to Third-Party Defs.' Butler and Waldron's Mots. to Dismiss Third-Party Compl. (hereinafter "O'Kieffe's Reply to Butler and Waldron") [78] at 5.)

For his part, Butler maintains that he has "never met, spoken with, or communicated with" any of the O'Kieffes, nor "encouraged directly or indirectly through Robert Woolard their loans, investments, or guarantee."  (Butler Aff., Ex. 1 to Butler's Reply in Supp. of Mot. to Dismiss [84] ¶ 5.)  Butler states that the "validity" of any guaranties he signed for SCB "remain[s] the subject of pending debate."  (Butler Aff., Ex. 1 to Butler's Reply [84], ¶ 8.)  Butler does not deny he knew of O'Kieffe and Robert Woolard's relationship, nor does he deny that he knew of Robert Woolard's efforts to solicit O'Kieffe's guaranty.  He notes, however, that Hyams's declaration says nothing about any activity that Butler engaged in within the state of Illinois.

Several documents do suggest Butler may have been a guarantor on the original loans.  He is listed as a guarantor in a May 16, 2006 letter from Argonaut Midwest to SCB in which Argonaut

---

[5](...continued)
and Karen Woolard and was managed by Robert Woolard.  (Hyams Decl. ¶ 11.)  In 2009, Cliffs and Kenwilago assigned their interests in the Branson property to Premiere Properties.  (Hyams Decl. ¶ 14.)

Midwest requests a $950,000 loan (May 16, 2006 Letter from Robert Maddox to SCB President, Ex. 9 to O'Kieffe's Resp., at 2) and on several other loan documents whose origin is uncertain. (*See* June 21, 2006 New Loan Application, Ex. 5 to O'Kieffe's Resp., at 1; Oct. 31, 2007 Modification Loan Summary, Ex. 6 to O'Kieffe's Resp., at 6; Dec. 19, 2007 Modification Loan Summary, Ex. 8 to O'Kieffe's Resp., at 1.) Butler is also copied on an October 12, 2010 letter from Simmons's attorney to Robert Woolard regarding the default on the Cliffs loan. (Oct. 12, 2010 Letter from Simmons's Attorney to Robert Woolard, Ex. F to Compl., at 2.) There is no evidence that any of these documents was prepared in or sent to Illinois or that Butler had any other contacts with Illinois.

### ii. Paul Waldron

With respect to Waldron, O'Kieffe urges that he and Waldron have a long-standing, if indirect, business relationship, and that the court should infer Waldron's participation in the agreement for Robert Woolard to solicit O'Kieffe's financial support. (Third-Party Pls.' Sur-Reply to Third-Party Def. Waldron's Mot. to Dismiss Third-Party Compl. (hereinafter "O'Kieffe's Reply to Waldron") [90] at 5-6.) O'Kieffe also names Waldron as an original guarantor on the Cliffs loan and, as with Butler, some documents in the record support that assertion. (*See* May 16, 2006 Letter from Robert Maddox to SCB President at 2; June 21, 2006 New Loan Application at 1; Oct. 31, 2007 Modification Loan Summary at 6; Dec. 19, 2007 Modification Loan Summary at 1; Oct. 12, 2010 Letter from Simmons's Attorney to Robert Woolard at 2.) Still, none of the documents bear any relation to Illinois.

Hyams's declaration also states that Butler told him he was a business partner of Waldron's, and that "[w]henever Waldron's signature was required on a document, Butler promptly obtained it." (Hyams Decl. ¶ 12). O'Kieffe asserts, further, that during 2003 and 2004, he loaned $365,000 to Argonaut Midwest, of which Waldron was vice-president and part owner. (O'Kieffe's Reply to Butler and Waldron at 5.) O'Kieffe thus concludes that he and Waldron "effectively were in

6

business together." (O'Kieffe's Reply to Waldron at 5.)

Waldron rejects any suggestion that he was involved in Robert Woolard's dealings with O'Kieffe or that he was "in business" with O'Kieffe. In his affidavit, Waldron asserts that he has "never met or had any written communications" with Robert Woolard, and that he has had no oral communication with Robert Woolard with the possible exception of "a conference call in the early 2000s" of which Waldron lacks "any present recollection." (Waldron Aff. [74] ¶ 8.) Waldron insists he had "no knowledge" of Woolard's family relationship with O'Kieffe, that he had no knowledge that O'Kieffe had any "significant personal wealth," and that he has "never met, spoken with, or communicated with . . . O'Kieffe." (Waldron Aff. ¶¶ 7, 14.) Waldron does not deny his relationship with Butler, but insists he did not know that SCB required additional collateral to extend the loans or that O'Kieffe signed the guaranties that made the extension possible. (Waldron Aff. ¶¶ 11, 15.) He flatly denies any active participation in securing the guaranties from O'Kieffe. (Waldron Aff. ¶ 17.)

## **DISCUSSION**

Third-Party Defendants have moved to dismiss O'Kieffe's complaint based on a lack of personal jurisdiction, as required by FED. R. CIV. P. 12(b)(2).[6] As the plaintiff, O'Kieffe has the burden to demonstrate the court's personal jurisdiction over the defendant. *Triad Capital Mgmt., LLC v. Private Equity Capital Corp.*, No. 07 C 3641, 2008 WL 4104357, at *2 (N.D. Ill. Aug. 25, 2008) (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997)). The plaintiff's burden is a modest one, requiring only "a prima facie showing of jurisdictional facts."[7]

---

[6] Third-Party Defendants also seek dismissal based on improper venue under FED. R. CIV. P. 12(b)(3), but because the court grants the motion to dismiss based on lack of personal jurisdiction, it need not discuss the propriety of the venue.

[7] The Seventh Circuit has held that a plaintiff's burden in demonstrating personal jurisdiction on a motion to dismiss depends on whether the court holds an evidentiary hearing. Should the district court hold an evidentiary hearing to determine personal jurisdiction, the plaintiff
(continued...)

7

*Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012) (citation omitted). On a motion to dismiss the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Id.*

An Illinois federal district court sitting in diversity jurisdiction has personal jurisdiction over a nonresident defendant only to the extent that an Illinois court would have personal jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 779 (7th Cir. 2003). The Illinois long-arm statute extends personal jurisdiction as far as permitted by the Illinois Constitution and the U.S. Constitution. 735 ILCS 5/2-209(c) ("A court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States."). But as the Seventh Circuit has explained, "there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction." *Hyatt Int'l*, 302 F.3d at 715; *see also Triad Capital Mgmt., LLC v. Private Equity Capital Corp.*, No. 07 C 3641, 2008 WL 4104357, at *3 (N.D. Ill. Aug. 25, 2008) (explaining that "the three requirements for personal jurisdiction collapse into a single analysis"). Consequently, the court may limit its analysis to whether an exercise of jurisdiction over Third-Party Defendants comports with federal due process.

Under the now familiar test set forth in *International Shoe,* the exercise of personal jurisdiction is constitutional under the Due Process Clause of the Fourteenth Amendment if a defendant has "certain minimum contacts" within the forum state. *Int'l Shoe Co. v. Washington*, 326

---

[7](...continued)
must establish jurisdiction by a preponderance of the evidence. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (citing *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)). But when the district court rules solely on the written submissions, without a hearing, the plaintiff must make only a prima facie showing of personal jurisdiction to survive a motion to dismiss. *Id.* In this case, the court did not hold an evidentiary hearing and, thus, O'Kieffe need only make a prima facie showing of the court's jurisdiction over Third-Party Defendants.

U.S. 310, 316 (1945). A court's exercise of specific personal jurisdiction[8] requires that "(1) the defendant must have purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland*, 682 F.3d at 673 (citations omitted). "[The] 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks and citations omitted). "This requirement is designed to ensure that the defendant retains sufficient, albeit minimal, ability to structure its activities so that it can reasonably anticipate the jurisdictions in which it will be required to answer for its conduct." *Purdue Research*, 338 F.3d at 780.

Even accepting the factual allegations in his complaint as true, O'Kieffe's submissions present no basis for the conclusion that Butler or Waldron ever purposefully availed themselves of the privilege of conducting business in Illinois. There is no evidence that either Waldron or Butler ever entered the state, nor any evidence that either of them made phone calls to or corresponded with anyone in Illinois. None of the relevant documents were executed in Illinois, nor is the residential development project, for which the loans were sought, in Illinois. O'Kieffe claims the court has jurisdiction over Butler and Waldron essentially because, as he alleges, they colluded with Woolard to solicit O'Kieffe (an Illinois resident) as a guarantor and, as the original guarantors on the loan, they obtained a benefit as a result of O'Kieffe's guaranty on the loan extension. This tangential relationship to Illinois, however, is far too attenuated. Even if Butler and Waldron were direct parties to one of the 2009 guaranty agreements with O'Kieffe, that contact alone would not

---

[8] O'Kieffe does not argue that the court has general personal jurisdiction over Butler or Waldron.

be sufficient to establish an Illinois court's jurisdiction over them. *See Citadel Group Ltd. v. Washington Reg'l Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008) ("[A] contract between a state resident and an out-of-state defendant alone does not automatically establish sufficient minimum contacts.").

O'Kieffe likens his claim to several cases in which out-of-state guarantors were successfully haled into Illinois, but in the cases he cites, the defendants had much more robust contact with Illinois. (O'Kieffe at 7-8.) For example, O'Kieffe relies on *O'Hare International Bank*, where guarantors from Oklahoma, Arkansas, Texas and Florida were haled into Illinois by a lessor "despite the fact that the physical location of negotiations for the lease and guaranty took place outside of the forum and the majority of guarantors were never present in the forum." (O'Kieffe's Resp. at 8.) In that case, however, the Seventh Circuit found the minimum contacts test satisfied and Illinois personal jurisdiction appropriate because

> [n]egotiations for the lease were commenced by a phone call to the lessor's Chicago office by one of the defendants; subsequent discussions with at least one of the defendants occurred in Illinois. The lease was not accepted until executed in Illinois and payments under it were to be made at Chicago, Illinois, or at such other place as the lessor shall designate. The guaranty in question specifically provided that it 'shall be construed according to the law of the State of Illinois, in which State it shall be performed.'

*O'Hare Int'l Bank*, 437 F.2d at 1176-77. Here, by contrast, no part of the negotiations for the underlying loans was conducted in Illinois, nor is there any evidence that either Butler or Waldron ever communicated with O'Kieffe in Illinois or elsewhere, for that matter. Notably, the guaranties O'Kieffe signed state that they are to be governed by the law of the state in which they were executed (*see, e.g.*, Cliffs Guaranty ¶ 13), and the first page lists a location of "Ozark, Missouri." (Cliffs Guaranty at 1; Kenwilago Guaranty at 1.) O'Kieffe's guaranties make no reference to Illinois at all. In other words, unlike the guaranties in *O'Hare International*, the Cliffs and Kenwilago guaranties are not governed by the law of the state asserting jurisdiction.

Butler and Waldron's contact with Illinois also appears slight relative to that of the defendant

in *Triad Capital Management*, another case O'Kieffe relies on. In that case, an out-of-state defendant was held subject to Illinois personal jurisdiction based on "intensive" negotiations conducted by e-mail, fax, and telephone with the Illinois plaintiff and on a contractual provision requiring the parties' purchase agreement be executed and performed in Illinois. *Triad Capital Mgmt., LLC v. Private Equity Capital Corp.*, No. 07 C 3641, 2008 WL 4104357, at *5-6 (N.D. Ill. Aug. 25, 2008). Likewise, in *BFS Diversified Products*, defendant-guarantors were held subject to personal jurisdiction in Indiana because they purchased products from the plaintiff-creditor in Indiana, sent payments to the plaintiff's Indiana address, and "generally conducted business" with the plaintiff's parent company in Indiana. *BFS Diversified Products, LLC v. Tolley-Hughes, Inc.*, No. 1:03-CV-59-LJM-WTL, 2003 WL 22327836, at *3 (S.D. Ind. Sept. 25, 2003). O'Kieffe has not alleged any contacts between Butler or Waldron and Illinois that are at all analogous to the contacts between the defendants and the forum states in the aforementioned cases.

Several of the cases cited by O'Kieffe involve claims brought by creditors against guarantors where the creditor depends upon the underlying contract (usually a loan document) to establish jurisdiction. For example, in *Forsythe v. Overmyer*, the Ninth Circuit court held a New York guarantor subject to California jurisdiction, because the underlying contract was negotiated in California and expressly subject to California law. 576 F.2d 779, 783 (9th Cir. 1978). The defendant-guarantor was not a party to the contract, but "[he] did, however, guarantee . . . obligations under it." *Id.*

In this case, by contrast, the underlying contract is a loan agreement governed by Missouri law (Cliffs Note at 2; Kenwilago Note at 2); *Forsythe* thus provides authority for holding O'Kieffe, as guarantor, subject to Missouri personal jurisdiction but does little to establish Illinois personal jurisdiction over Butler and Waldron. O'Kieffe persists, though, arguing that "so long as reasonable, '[a]n out-of-state act having an effect within the state may be sufficient to support jurisdiction.'" (O'Kieffe's Resp. at 7 (quoting *Forsythe*, 576 F.2d at 783).) But the *Forsythe* court explained further

11

that "in such a case we must be particularly careful to assure that the exercise of jurisdiction is reasonable" and noted that "the degree to which a defendant interjects himself into the state affects the fairness of subjecting him to jurisdiction." *Forsythe*, 576 F.2d at 783 (internal quotation marks and citation omitted). Even taking O'Kieffe's factual allegations as true, Butler and Waldron can hardly be said to have "interject[ed]" themselves into Illinois simply by being the original guarantors on Missouri loans later guaranteed by O'Kieffe or by encouraging Woolard to solicit O'Kieffe's guaranty. O'Kieffe relies on several other cases of a similar vein, but they are equally unhelpful to his argument. See *Citizens Bank v. Parnes,* 376 F. App'x 496, 501 (6th Cir. 2010) (holding a New York guarantor subject to personal jurisdiction in Michigan, in part because the underlying loan specified it was executed in Michigan and governed by Michigan law); *Marathon Metallic Bldg. Co. v. Mountain Empire Constr. Co.*, 653 F.2d 921, 923 (5th Cir. 1981) (holding a Colorado guarantor subject to personal jurisdiction in Texas, in part because the underlying contract stipulated it would be governed by Texas law); *United Airlines, Inc. v. ALG, Inc.*, 873 F. Supp. 147, 152 (N.D. Ill. 1995) (holding Tajik guarantors subject to Illinois personal jurisdiction, in part because the underlying lease contained forum selection and choice-of-law clauses favoring Illinois).

Nor is O'Kieffe aided by his reliance on *National Can Corp. v. K Beverage Co.*, 674 F.2d 1134 (6th Cir. 1982). He cites that case for the proposition that "guaranties, when signed by a person with an economic interest in the corporation, furnish[] the necessary minimum contacts." *Nat'l Can Corp.*, 674 F.2d at 1137. In that case, a Minnesota guarantor was haled into Kentucky court because she signed a guaranty on behalf of defendant beverage company, a Kentucky resident in which the guarantor owned shares. *Id.* Again, O'Kieffe confuses his analogy: the Minnesota guarantor in *National Can* does not attempt to hale her co-guarantors, or other parties involved in the sales contract, into court in her state, which is what O'Kieffe aims to do here. As with the previously disposed of line of cases, *National Can* would be helpful to Waldron and Butler were they attempting to sue O'Kieffe in Missouri, but have little bearing on the case at bar.

Finally, O'Kieffe makes an efficiency argument, asserting that Illinois has an interest in adjudicating the entire action in one forum: "Illinois already has a substantial interest in adjudicating the underlying action against O'Kieffe. It follows that Illinois has a substantial interest in adjudicating O'Kieffe's third-party action against all of the guarantors." (O'Kieffe's Resp. at 12.) The court presumes that the States of Arkansas (where the lender is located) and Missouri (where the residential development project is located and the loan documents and guaranties were executed) have some interest in the loans and corresponding guaranties, as well. In any event, efficiency concerns do not trump Butler's and Waldron's due process rights. Though Simmons filed its lawsuit against O'Kieffe in Illinois—most likely because O'Kieffe is subject to general jurisdiction in Illinois—it does not follow that Butler and Waldron are therefore subject to specific personal jurisdiction in Illinois as third-party defendants.

## **CONCLUSION**

For the reasons explained, the court grants Butler's motion to dismiss [56] as well as Waldron's motion to dismiss [46]. The court also grants Maddox's motion to dismiss [88] as unopposed.

ENTER:

Dated: July 20, 2012

_____
REBECCA R. PALLMEYER
United States District Judge